Jane LEAKE, Plaintiff,

v.

UNIVERSITY OF CINCINNATI, et al., Defendants.

No. C–3–80–449.

United States District Court, S. D. Ohio, W. D.

Jan. 29, 1982.

Charles E. Guerrier, Barbara Kaye Besser, Cleveland, Ohio, Randal S. Bloch, Cincinnati, Ohio, for plaintiff.

Paul Nemann, Cincinnati, Ohio, for defendants.

## DECISION AND ENTRY OVERRULING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; CONFERENCE CALL SET TO DETERMINE TRIAL DATE AND OTHER DATES

RICE, District Judge.

### I. *Introduction*

This matter is before the Court pursuant to the Motion for Summary Judgment filed by Defendant Warren Bennis, Defendant William Aeschbacher, Defendant Campbell Crockett, and Defendant University of Cincinnati (hereinafter referred to collectively as Defendants). Briefly, the relevant background of this action is as follows. Since 1969, Plaintiff Jane Leake has been a professor of history at the Raymond Walters General and Technical College of the University of Cincinnati (hereinafter referred to as Raymond Walters College), a two year branch campus of the University. Prior to that time, since 1961, Plaintiff had taught in various capacities at the main campus of the University of Cincinnati, including visiting professorships in the department of history in 1965–66, 1966–67, and 1968–69. Plaintiff had attempted to obtain a regular position at the main campus of the University prior to accepting the position at Raymond Walters College, but had been unable to do so. During the 1971–72 academic year, Dabney Park, an assistant professor of history at the main campus, was on a leave of absence, and Guido Ruggiero was hired as a visiting professor of history to replace Park for that year. During the winter of 1972, the University approved an extension of Park's leave of absence, and again searched for a person to fill his position. Although approximately twenty persons applied for the position, only Ruggiero was interviewed by the Search Committee. That Committee recommended that Ruggiero be hired for the 1972–1973 academic year as a replacement for Park, and the Department of History approved this recommendation with the understanding that if feasible, the position would be permanent, or tenure track. Aeschbacher, the Head of the History Department, conveyed this recommendation to Campbell Crockett, the Dean of the College of Arts and Sciences, and on March 29, 1972, Crockett wrote to Ruggiero, offering him a two year appointment in the History Department. During the summer of 1972, Plaintiff became aware of the possibility of a regular appointment in medieval history at the main campus, and wrote to Aeschbacher to inquire about such a possibility. In September, 1972, Aeschbacher wrote to Plaintiff informing her that no opening in medieval studies was available. On October 3, 1972, the Board of Trustees of the University approved Ruggiero's appointment.

On April 17, 1973, Plaintiff filed charges with the EEOC, and after receiving her Notice of Right to Sue from that agency on December 1, 1975, filed the within action on February 24, 1976, alleging that Defendants had violated her rights under 42 U.S.C.

§§ 2000e, et seq., and 20 U.S.C. §§ 1681, et seq. Judge Porter dismissed Plaintiff's Complaint on September 16, 1976, finding that since Plaintiff had not filed her charge with the EEOC within 180 days of October 3, 1972, her claim was time-barred under 42 U.S.C. § 2000e–5(e). Judge Porter specifically ruled that the statutory period in § 2000e–5(e) was jurisdictional and could not be waived by either party. In addition, the Judge rejected Plaintiff's claim of a continuing violation, by finding that the transaction in question was isolated. Finally, Judge Porter dismissed Plaintiff's § 1681 claim by ruling that § 1681 did not provide a private right of action. On appeal, the Sixth Circuit affirmed the dismissal of Plaintiff's § 1681 claim, by holding that although a private right of action could be inferred under Title IX, the protection of § 1681 did not extend to employees of educational institutions. *Leake v. University of Cincinnati*, 605 F.2d 255, 259–260 (6th Cir. 1979) (*Leake*). In that decision, the Sixth Circuit also reversed the dismissal of Plaintiff's Title VII claims, and remanded the case to the district court. *Id.* at 260. The Court found that although Plaintiff's EEOC charge was not filed within 180 days of the alleged discriminatory act, "negotiations between plaintiff and the University and the affirmative conduct of defendant as set forth in the University counsel's letter ... tolled the time period within which plaintiff was required to file charges." *Id.* at 258.

Following remand, Defendants filed an answer (Doc. # 19), and the case was transferred from Judge Porter's docket to the docket of Judge Rubin (Doc. # 30), and finally, to this Court's docket on October 9, 1980 (Doc. # 32). On July 10, 1981, Defendants filed the Motion for Summary Judgment which is presently under consideration. In the memorandum accompanying that Motion, Defendants have presented four points with respect to which, they contend, there are no genuine issues of material fact. First, Defendants claim that Plaintiff does not have standing to maintain the present action because she did not apply for the job given to Guido Ruggiero. Second, Defendants assert that Plaintiff is precluded from recovery herein, because the operative acts forming the basis of her claim occurred prior to the time, i.e., March 24, 1972, when Title VII was amended to make parties such as the University of Cincinnati legally responsible for alleged discriminatory actions. Third, Defendants maintain that even if Plaintiff had applied, she would not have been hired. As a fourth and final basis for summary judgment, Defendants argue that Plaintiff's charge was not timely filed with the EEOC because it was not filed within either 180 or 224 days (allowing for tolling of 44 days, pursuant to the Sixth Circuit decision in *Leake*) of the March 29, 1972 offer of employment to Ruggiero.

On August 10, 1981, Plaintiff filed a memorandum responding to the above points, and on August 12, 1981, arguments on the within matter were presented to the Court pursuant to an oral hearing. After consideration of the properly authenticated materials submitted herein,[1] the Court has concluded that genuine issues of material fact do exist, and that Defendants are not entitled to summary judgment as a matter of law. In setting forth the reasons for its decision, the Court will briefly summarize the appropriate standards for determination of a motion brought under Fed.R.Civ.P. 56, and will then apply those criteria to the issues raised by Defendants.

## II. *Rule 56 Standards*

With regard to summary judgment, Rule 56(c) provides that:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

1. The materials attached to Plaintiff's memorandum were not submitted in compliance with Fed.R.Civ.P. 56(e), and were, accordingly, not considered by the Court.

In *McHenry v. Ford Motor Co.*, 269 F.2d 18 (6th Cir. 1959), the Sixth Circuit indicated that:

> On considering such a [summary judgment] motion the pleadings are to be liberally construed in favor of the party opposing the motion. . . . Moreover, the Court is required to take the view most favorable to the party opposing the motion, giving that party the benefit of all favorable inferences that may be drawn from the evidence.

*Id.* at 22 (citations omitted) (bracketed material added). In addition, in *New Jersey Life Insurance Co. v. Getz*, 622 F.2d 198 (6th Cir. 1980), the Court noted that in ruling upon a motion for summary judgment, the court "cannot decide a question of fact but must determine whether a 'material' question of fact exists." *Id.* at 200. Finally, in *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Supreme Court elaborated on the meaning of Rule 56 as follows:

> [T]he issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.

*Id.* at 288–289, 88 S.Ct. at 1592. With these standards in mind, the Court now turns to consideration of those grounds alleged by Defendants in support of their request for summary judgment.

### III. *Standing*

As was previously noted, Defendants' first argument in support of summary judgment is that the Plaintiff lacks standing to allege discrimination because she did not apply for the job awarded to Guido Ruggiero. The information thus far submitted to the Court indicates that on various occasions, beginning at least as early as 1961 and continuing through the academic year 1968–1969, Plaintiff made inquiries about, or formal application for, teaching positions with the University of Cincinnati history department (Leake deposition, pp. 63, 64, 66, 68, 71; Leake deposition corrections, pp. 1–2). In 1961, Plaintiff approached Hilmar Krieger, Dean of the University College, and inquired about a job either in the history department, or in the University College, teaching history (Leake deposition, p. 63). In response to this inquiry, she was informed that he would not consider a woman for the job (Leake deposition, p. 63). In 1963, Plaintiff made formal written application for a tenure-track position with the history department, to Dr. Thomas Bonner, the head of that department, but was informed that he had no need for a person with Leake's specialty, i.e., in Medieval History (Leake deposition, pp. 64–65; Leake deposition corrections, pp. 1–2). At that time, due to information conveyed by a colleague and member of the history department, Vsevolod Slessarev, Leake was under the impression that in fact, the history department did have a need for a position in Medieval History (Leake deposition, pp. 10, 64, 65). In September, 1967, Plaintiff again made formal application to Dr. Bonner for a regular, or tenure-track, appointment, and received a reply from Bonner indicating that he would consider her application if a regular or visiting appointment became available (Leake deposition, p. 66). Later that fall, Plaintiff learned that another Medievalist, Dabney Park, had been hired for a regular position with the history department, effective for the 1968–1969 academic year, and that although Bonner stated that he had given Leake's application to the chairman of the search committee considering applicants for the appointment, her application had not been considered by that committee (Leake deposition, pp. 66, 67, 68, 69). There is no indication that the history department advertised or sought applicants for the position given to Dabney Park (Leake deposition, pp. 72–73).

Another permanent position in the history department, to begin in the academic year 1968–1969, became available in the

winter of 1967–1968, and Plaintiff applied for this position, after receiving some assurance from Dr. Bonner that he felt the history department would offer the job (Leake deposition, pp. 64, 70, 71). In February, 1968, Plaintiff was interviewed, but was informed that the committee concluded that they could not hire her because they had just hired a Medievalist, *i.e.*, Dabney Park, in the fall (Leake deposition, p. 74). A special committee was then appointed by Bonner to study the problem of Leake's appointment in the department, and that committee upheld the decision of the previous committee, which had recommended that Leake be given temporary or visiting appointments as long as the department needed her, or until such time as they could afford another Medievalist (Leake deposition, pp. 74–75).

During the years 1965–1966, 1966–1967, and 1968–1969, Plaintiff taught as a visiting professor in the University of Cincinnati history department (Complaint, ¶ 18; Answer, ¶ 5). In 1969, Plaintiff was given an appointment as an associate professor of history at a branch of the University, the Raymond Walters College, and was still employed there in 1972, at the time of the events forming the basis of her claim herein. (Complaint, ¶ 19, ¶ 20, ¶ 21; Answer ¶ 5; Leake deposition, pp. 23–24). In January, 1972, Aeschbacher, the then head of the history department, sent notice of an available Medievalist position to the history departments of fifty colleges and universities, and to the American Historical Association Bulletin (Aeschbacher affidavit, ¶ 1, ¶ 2, ¶ 3; exhibits 1 and 2 attached to Aeschbacher affidavit). There is no indication, however, that any notice of the potential position was either sent to the Raymond Walters College, or circulated among University of Cincinnati personnel. Likewise, there is no indication that Leake saw the notice until well after Ruggiero's appointment was approved by the Board of Trustees (exhibit 2 attached to Aeschbacher affidavit, Leake deposition, p. 6; Complaint, ¶ 40; Answer, ¶ 18).

In February, 1972, after hearing a rumor that Dabney Park might not be rehired, Plaintiff asked University Provost O'Neill about the nature of the position, if any, which was available. In response to this inquiry, O'Neill informed her that the form was on his desk at that time, and that it was a visiting position (Leake deposition, pp. 5, 6, 15, 16). In the spring of 1972, Leake again heard a rumor that Park might not be given tenure, and then wrote a letter to Aeschbacher in August, 1972, requesting that she be considered for a position in medieval studies, should one be available (Leake deposition, pp. 15, 16; Leake deposition exhibit 1). In September, 1972, Aeschbacher wrote to Plaintiff, indicating that there was no position available, but did not indicate that Ruggiero had been given a tenure-track appointment (Complaint, ¶ 44, Answer, ¶ 22; Leake deposition, pp. 14, 17). Prior to August, 1972, Leake did not submit any formal application to Aeschbacher (Aeschbacher affidavit, ¶ 3; Leake deposition, pp. 6, 16; Leake deposition exhibit 1).

In determining whether the failure to make a job application constitutes a bar to recovery under Title VII, Courts have used different approaches, by treating the issue as one of standing, or as an aspect of the substantive elements of the plaintiff's cause of action. Compare: *Jackson v. Dukakis*, 526 F.2d 64, 65–67 (1st Cir. 1975) (*Jackson*) (holding that plaintiff's failure to even apply for a job with the agency sued prevented him from sustaining the injury in fact which is required for standing); *Foreman v. General Motors Corp.*, 473 F.Supp. 166, 175–176 (E.D.Mich.1979) (*Foreman*) (lack of allegations in complaint indicating that any plaintiff applied to corporate defendants for employment, or was refused employment, precludes standing); *Pearson v. Furnco Construction Co.*, 563 F.2d 815, 818 (7th Cir. 1977) (*Pearson*) (plaintiff's demonstration of interest in employment, brought to attention of employer, may be sufficient to confer standing); *Tagupa v. Board of Directors*, 633 F.2d 1309, 1311–1312 (9th Cir. 1980) (*Tagupa*) (holding in action brought under 42 U.S.C. §§ 1981 and 1983, that application for a job is a necessary element of the plaintiff's cause of action). After a

careful examination of these authorities, this Court has concluded that they do not furnish a basis for granting summary judgment for Defendants. The present case may immediately be distinguished from the *Jackson, Foreman,* and *Tagupa* cases because the Plaintiff herein, unlike the litigants in those cases, was employed by the Defendant employer, albeit in a different capacity from that sought, and had a history of prior applications for positions similar to the one in question.[2] In *Foreman,* for example, a class action had been brought by persons enrolled as employment or training applicants in the Concentrated Employment Program, 473 F.Supp. at 171, against, *inter alia,* at least fifty corporate defendants located in Detroit and surrounding communities, *id.* at 170, 173. However, none of the defendant employers had either received applications for employment from any plaintiff, or refused employment to any plaintiff. *Id.* at 175. Based on these facts, the Court found the named plaintiffs did not have standing, and could not maintain the class action. *Id.* Likewise, in *Jackson,* the plaintiff, Jackson, had joined with two others in a class action brought against the heads of sixteen state agencies, 526 F.2d at 64, for allegedly racially discriminatory hiring practices. *Id.* at 65. Jackson was dismissed from the action for lack of standing, since he had never applied for employment with any of the agencies. *Id.* On appeal, the First Circuit affirmed the dismissal, finding that absent a job application, the district court could not establish, "except by conjecture, any connection between the claimed injuries and the allegedly discriminatory acts." *Id.* at 66.

In the present case, no such conjecture is required, as the connection between the alleged discriminatory acts and Leake's reputed injuries is obvious, *Tagupa,* 633 F.2d at 1312, given her numerous prior attempts to secure a tenured position in the history department; her February inquiry to Provost O'Neill regarding the nature of the rumored vacancy; his response to that inquiry, and the indications thus far in the record that had Leake been advised of the true nature of the appointment, she would have applied for the position given to Ruggiero. In this context, the Court finds the *Pearson* case to be most appropriate for application herein. In *Pearson,* eight black bricklayers brought suit against the Defendant, Furnco Construction Co., alleging discrimination because Furnco had obtained permission from the Labor Department for seventeen white Canadian bricklayers to enter the United States on a non-immigrant

---

2. *Tagupa* additionally is not applicable because, as will later be explained in the text of this Opinion, it did not involve an alleged failure to notify the plaintiff of an available job or position. Moreover, although the *Tagupa* Court indicated that a job application is a necessary element of an employment discrimination claim, 563 F.2d at 818, the Court did note that "circumstances may excuse the requirement that a plaintiff apply for the position." *Id.* at n.2, citing *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 365–367, 97 S.Ct. 1843, 1869–1870, 52 L.Ed.2d 396 (1977). In that case, the Supreme Court said:

> If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. The same messages can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices—*by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes his vacancies, his recruitment techniques, his responses to cas-*

*ual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups*
. . . .
. . . .
To conclude that a person's failure to submit an application for a job does not inevitably and forever foreclose his entitlement to seniority relief under Title VII is a far cry, however, from holding that nonapplicants are always entitled to such relief. A nonapplicant must show that he was a potential victim of unlawful discrimination. Because he is necessarily claiming that he was deterred from applying for the job by the employer's discriminatory practices, his is the not always easy burden of proving that he would have applied for the job had it not been for those practices. . . . *When this burden is met, the nonapplicant is in a position analogous to that of an applicant.*
*Id.* at 365–368, 97 S.Ct. at 1869–1871. (emphasis added). It is entirely possible that Plaintiff may be able to establish, under this standard, that she should be treated as an applicant.

basis for temporary employment with Furnco. 563 F.2d at 817. The district court dismissed the case for lack of standing, because none of the plaintiffs had applied for employment at the job site in question. *Id.* The plaintiffs had, however, sought employment at other Furnco job sites, by writing letters advising of their availability, or by leaving their names, addresses, and telephone numbers with company representatives. *Id.* The Court of Appeals reversed the dismissal of the claims against the Defendant employer, *id.* at 820, stating as follows:

> Furnco and the district court proceeded on the theory that plaintiffs' inability to show they had applied for the Inland job established they had suffered no actual injury and had no standing to complain. *We think, however, that these plaintiffs alleged a sufficient demonstration of interest in employment, which they brought to the attention of Furnco, so that it is fair and reasonable to treat plaintiffs as applicants for the Inland job if they can show, as they alleged, that they were available and would have applied if they had been made aware of the job.* See, *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 363, 97 S.Ct. 1843 [1868], 52 L.Ed.2d 396 (1977). *Such proof would adequately demonstrate injury to plaintiffs and entitle them, under the circumstances, to the inference of discrimination recognized in McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 [1824], 36 L.Ed.2d 668 (1973) assuming plaintiffs can prove their qualifications.

563 F.2d at 818 (emphasis added). The Court in *Pearson* then said:

> Putting the matter another way, plaintiffs have alleged a particular demonstrable relationship between themselves and Furnco, *so that Furnco's failure to notify plaintiffs of the Inland job could be found tantamount to refusal to employ them.*

*Id.* (emphasis added).

Like *Pearson*, this case involves an alleged failure to notify of an available posi-

tion.[3] However, since this action is in a different procedural posture than *Pearson*, i.e., before the Court pursuant to a summary judgment motion rather than a motion to dismiss, the relevant inquiry herein is whether there are issues of material fact regarding either Plaintiff's demonstration of interest in a tenured position with the history department, or the Defendants' awareness of that fact. The Court finds that there are such issues of material fact. For example, Aeschbacher indicated that he had no knowledge or belief that Leake would be interested in the position offered to Ruggiero (Aeschbacher affidavit, ¶ 13). However, Leake indicated that in 1969, she told Aeschbacher that she was interested in a position on the main campus, and that "[h]e did know that I had gone to Raymond Walters branch with reluctance and only after a position seemed closed out to me on the main campus." (Leake deposition, pp. 23, 25). In addition, it appears that Defendant Bennis knew of Leake's previous attempts to enter the history department, that Provost O'Neill was directly aware of her interest, and that one of the two members of the recruitment committee responsible for recommending a Medievalist in 1972, Vsevolod Slessarev, knew of Plaintiff's desire to obtain a tenured position in the history department (Leake deposition, pp. 5–6, 22, 38–39; Aeschbacher affidavit, ¶ 4). Therefore, based on the foregoing facts, which suggest that Defendants or their agents were aware of Leake's interest in a tenured position, the Court concludes that it would be inappropriate to grant summary judgment for Defendants on the basis of Plaintiff's failure to formally apply for a position with the history department prior to March, 1972.

## IV. *Time of Operative Events Forming the Basis of Plaintiff's Claim*

The second ground urged by Defendants in support of their Motion for Summary Judgment is that Plaintiff is barred from

---

**3.** *See:* footnote 2, *supra;* Complaint, ¶ 40, ¶ 41, ¶ 48.

recovery herein, because the acts upon which her claim is based occurred prior to the March 24, 1972 effective date of the Amendments to Title VII, which for the first time, included institutions such as the University of Cincinnati within the scope of Title VII's prohibition of discriminatory employment practices.[4] Plaintiff has responded to this contention by arguing that the violation alleged is one which is continuing in nature "because the Defendants have operated, and are operating under an ongoing policy or practice which discriminates against potential women applicants." (Doc. # 41, p. 12).

Without repeating the facts which have been previously set forth, the Court ventures the comment that alleged discriminatory acts could be said to have occurred at the following times: as early as January, 1972, when the notice of an available position was sent to various colleges, but was apparently not sent to he University of Cincinnati or its branches; on March 6 and 7, 1972, when recommendations were made that the Ruggiero position be made tenure track; or on March 29, 1972, *after the amendment of Title VII*, when employment was offered to Ruggiero. In addition, alleged discriminatory acts may be said to have occurred: in September, 1972, when Aeschbacher informed Plaintiff that no position was available; during the period of time between August 7, 1972 to October 3, 1972, when Aeschbacher was aware of Leake's interest but failed to disclose the nature of Ruggiero's status; or on October 3, 1972, when the Board of Trustees approved the recommendation of the history department regarding the employment of Ruggiero.[5] It could also be argued that these acts constitute a single transaction, which ended in October, 1972, well after the amendment of Title VII. Because there are conflicting inferences which can be drawn from the facts herein, *see* Footnote 4, *supra*, the Court concludes that Defendants are not entitled to summary judgment on the ground that the operative acts underlying

---

**4.** The Court notes that this contention is directly contradicted by Defendants' later assertion that the 180 day time period specified in 42 U.S.C. § 2000e–5(e) should be calculated from *March 29, 1972*, the date upon which Dean Campbell Crockett made an offer of employment to Guido Ruggiero. *See:* Doc. # 36, p. 10; exhibit 5 Attached to Aeschbacher affidavit. Thus, the Defendants have argued on one hand that no relevant acts occurred after March 7, 1972, and on the other, that the last relevant act occurred on March 29, 1972. The Court has some difficulty with the concept that the same undisputed facts can be read as making an event operative in one context, and of no effect in another. Although it is factually undisputed that the department of history recommended on March 6, 1972 that Ruggiero be offered a tenure track position if feasible, that this recommendation was conveyed in writing to Dean Crockett by Aeschbacher on March 7, 1972, that Crockett offered the position to Ruggiero on March 29, 1972, and that the Board of Trustees approved the department of history's recommendation in October, 1972 (Aeschbacher affidavit, ¶ 6, ¶ 7, ¶ 8; Complaint, ¶ 45; Answer ¶ 22), Defendants themselves draw conflicting inferences, as noted above, from these facts. Under such circumstances, Defendants' Motion for Summary Judgment should be denied on this basis alone. *S. J. Groves & Sons*

*Co. v. Ohio Turnpike Comm'n*, 315 F.2d 235, 237–238 (6th Cir.), cert. denied 375 U.S. 824, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963).

**5.** It could also be argued, and was advanced before the Sixth Circuit on appeal, *see, Leake, supra*, 605 F.2d 255, 258, n.5 (6th Cir. 1979), that the alleged discriminatory act occurred on November 15, 1972, when Aeschbacher formally notified Plaintiff of Ruggerio's status. *Id.* The Sixth Circuit rejected this theory, by finding that the district court's determination of October 3, 1972, as the date of the alleged discrimination, was not *clearly erroneous. Id.* In so ruling, the Court of Appeals appeared to place reliance on the EEOC's concession that the relevant date was October 3, 1972. *Id.* To the extent that any inference can be drawn from this ruling, it would appear to be in Plaintiff's favor, *i.e.*, that the Sixth Circuit considered November 15, 1972 as a possible date, but concluded that in light of the EEOC's concession, the district court had not erred in finding October 3, 1972 to be the date of the discriminatory act. In this Court's opinion, the November 15, 1972 letter is not an appropriate date for limitations purposes. Insofar as formal approval of Ruggiero's appointment had been given *prior* to that letter, it is not a significant event in the chain of operative circumstances surrounding this case.

Plaintiff's claim occurred prior to March 24, 1972.[6]

## V. Plaintiff's Qualifications for the Ruggiero Position

Defendants' third contention in support of their Motion for Summary Judgment is that even if Plaintiff had applied for the Ruggiero position, she would not have been hired, first because she did not have the appropriate specialty which was being sought by the history department, and second, because for some time prior to 1972, the history department had followed a policy of hiring as new appointees no one above the Assistant Professor level and only new Ph.D.'s with no prior experience. The only exception to this policy would have been the hiring of available scholars with national reputations. (Aeschbacher affidavit, ¶ 3). Plaintiff, however, claims that *post hoc* arguments in defense of an employer's actions should be looked at askance.[7] Plaintiff also maintains that Ruggiero did not have his PhD, and that she did possess a national or international reputation in her field (Leake deposition, pp. 11, 12).

After an analysis of the documents submitted, the Court has determined that there are material issues of fact with regard to whether Plaintiff would have been hired for the position in question, and that, therefore, it would not be appropriate to grant summary judgment to Defendants. Aeschbacher's affidavit indicates that Plaintiff would not have been hired even if she had applied, because the Department at that time had a need to hire someone with a specialty in late Medieval history with a specialization in intellectual, urban, French, or German areas, rather than in early Medieval history, in which Plaintiff specialized (Aeschbacher affidavit, ¶ 12). However, the notice of appointment sent to various colleges in January, 1972 states the position to be as follows:

> Medieval history—probably a one year appointment. Specialization *could* be in intellectual, urban, or French, or German areas.

(exhibit 1 attached to Aeschbacher affidavit) (emphasis added). The use of the word "could," raises an inference, contrary to that contained in the Aeschbacher affidavit, that expertise in the above-listed areas was not an absolute requirement which would have precluded persons such as Plaintiff from applying and being selected for the position. Moreover, other contrary inferences may be derived from the fact that the teaching position being filled in 1972 was that which had been awarded to Dabney Park in 1967. As was previously indicated, Plaintiff did apply for that 1967 position, but her application was not considered by the committee. In the explanations given to Plaintiff of why her application was not considered, there is no indication that she was rejected because her specialty was not appropriate (Leake deposition, pp. 66, 67,

---

**6.** Indeed, such a finding, i.e., that the alleged discrimination could only have occurred on March 6 or 7, 1972, would border on the absurd, insofar as it would permit Plaintiff's time for filing EEOC charges to elapse prior to the time when she became aware of the alleged discrimination.

**7.** *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 249, 101 S.Ct. 1089, 1091, 67 L.Ed.2d 207 (1981) (*Burdine*) has been cited by Defendants as "hinting" at this proposition. This Court has been unable to find any discussion in *Burdine* regarding *post hoc* justifications for employment decisions. *Burdine* merely stated that the defendant has the burden, once a prima facie case of discrimination has been established, " 'to articulate some legitimate, non-discriminatory reason for the employee's rejection.' " *Id.* at 253, 101 S.Ct. at

1093. (citation omitted). The Court further noted that:

> It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant.

*Id.* at 254–255, 101 S.Ct. at 1094. It may be that *"post-hoc"* justifications, insofar as they are not credible, or conflict with more direct evidence found nearer the time of the alleged discriminatory act, may not be sufficient to raise a genuine issue of fact, or may be shown by a plaintiff to be pretextual. *Burdine*, however, makes no comment on this subject.

68). Therefore, the inference may be drawn that Plaintiff would have been qualified, and may have been selected for the Dabney Park vacancy in 1972, had she been aware of its existence, and applied.

As was indicated above, Defendants contend also that, as the history department had a policy of hiring only new PhDs with no experience, Plaintiff would not have been hired even if she had possessed an appropriate specialization. However, the materials under consideration herein reveal various facts which controvert that assertion. Again, in the January, 1972 announcement of available positions, two of the positions advertised contained specific requirements of *teaching experience* (exhibit 1 Attached to Aeschbacher affidavit). In addition, although Plaintiff was employed by the history department until 1969, she was not aware that the department had such a policy (Leake deposition, p. 12). Moreover, despite the fact that Plaintiff was not a new PhD in 1967, or in 1968, when she applied for positions with the history department, and then had substantial teaching experience (Leake deposition, p. 11), there is no indication that these factors were a consideration in the history department's failure to consider her application for the Dabney Park position in 1967, or in its rejection of her for the Western Civilization position in 1968 (Leake deposition, p. 74). Finally, while Plaintiff's statements regarding her status may be considered self-serving, there is no information controverting her claim that she has a national reputation as a Medieval scholar. Thus, based on all of the foregoing facts, which indicate that contrary inferences may be drawn with regard to whether Plaintiff would have been hired for the 1972 position awarded to Guido Ruggiero, the Court concludes that summary judgment may not be awarded on the basis of Defendants' contention that Plaintiff would not have been hired if she had applied.

## VI. *Timeliness of the EEOC Charge*

Defendants' fourth and final argument in support of their Motion for Summary Judgment is that Plaintiff's EEOC charge, filed on April 17, 1973, was not timely because it was not filed within 180 days of the March 29, 1972, offer of employment to Guido Ruggiero. To the extent that the Court has previously concluded that the events herein may be considered to be part of a single transaction ending on October 3, 1972, *see*, Part IV of this entry, there is no need for a lengthy discussion of this point, because the Sixth Circuit has already concluded that Plaintiff's EEOC charge was filed in a timely fashion in relation to the October 3, 1972, date. *See, Leake, supra*, 605 F.2d 255, 258 (6th Cir. 1979). To the extent that Defendants' present argument is an attempt to resurrect issues which have previously been determined by this Court, and by the Sixth Circuit, *see*, footnote 5, *supra*, it would appear to be inappropriate.

Defendants, however, maintain that because this case was previously argued only upon a motion to dismiss, they were limited to the facts which appeared in the Complaint. They now argue that the October 3, 1972 decision by the Board of Trustees was meaningless, "after-the-fact approval" (Doc. # 36, p. 11) and that the relevant limitations date is March 29, 1972, when the job offer was made to Ruggiero.[8] They further contend, citing *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) (*Ricks*), that the proper focus should be on the time of the alleged discriminatory acts, rather than when the consequences of the acts become

---

**8.** This argument is somewhat quixotic, given that the Complaint clearly discloses the relevant operative facts, including: advertisement of the position (¶ 34); the actions and recommendations of the search committee and the department of history (¶ 35, ¶ 36, ¶ 37, ¶ 38), and the action of the Board of Trustees in October, 1972 (¶ 45). The Court has found nothing in the material submitted by Defendants which elaborate in any material way upon these allegations. In short, there is nothing to suggest that the argument which is now being made, could not have been advanced on the basis of the allegations contained in the Complaint. Moreover, to the extent that Defendants draw contrary inferences from the same undisputed facts, *see*, footnote 4, *supra*, summary judgment on this issue is inappropriate.

most painful. The Court does not feel that the *Ricks* decision furnishes any support for the Defendants' position. *Ricks* may immediately be distinguished, because the plaintiff therein was protesting his own denial of tenure, which had been occasioned through an administrative process in which he had personally been a participant. *Id.* at 252, 101 S.Ct. at 501. Conversely, in the present case, Plaintiff did not even learn of Ruggiero's appointment to a tenure track position until *after* the Board of Trustees approved the appointment in October, 1972. To the extent that applying the March 29, 1972 date would bar Plaintiff's claim, or that of any other person in similar circumstances, from recovery prior to the time its existence would have been revealed, *see*, footnote 6, *supra*, the Court declines to issue a ruling which would approve such a clearly untenable result.

Assuming *arguendo*, however, that *Ricks* does apply, the Court notes that the board of trustees in that case on March 13, 1974, officially adopted a faculty senate recommendation, to deny Ricks tenure. A letter was sent to Ricks on June 26, 1974, informing him of the board's action, and offering him a one-year terminal contract which would expire on June 30, 1975. *Id.* at 252–253, 101 S.Ct. at 501. During that time, Ricks also had a grievance in process regarding the tenure recommendations, *id.* at 252, 101 S.Ct. at 501, and on September 12, 1974, Ricks was notified by the board that it had denied his grievance. *Id.* at 254, 101 S.Ct. at 502. Ricks filed a discrimination charge on April 4, 1975, *id.*, but the district court dismissed his complaint on the ground that the limitations period applicable to his claim had begun to run on June 26, 1974, when he was notified that he would be given a terminal contract. *Id.* at 255, 101 S.Ct. at 502. The Court of Appeals reversed, finding that the applicable date should have been the date Ricks' terminal contract expired. *Id.* The Supreme Court reversed the Court of Appeals, *id.* at 256, 101 S.Ct. at 503, and held that the limitations period began to run when the tenure decision was made and Ricks was notified. *Id.* at 259, 101 S.Ct. at 504. In determining that date, the Court rejected the June 30, 1975 date, because the alleged discriminatory act was not Ricks' termination, but the denial of tenure, *id.* at 258–259, 101 S.Ct. at 504. The Court also rejected the September 12, 1974 date because the Board "had made clear well before September 12 that it had *formally* rejected Ricks' tenure bid." *Id.* at 261, 101 S.Ct. at 505. (emphasis added). The Court found that the June 26, 1974 date used by the district court was not erroneous, *id.* at 262, 101 S.Ct. at 506, because by that time the college had established its official position, *id.*, of which Ricks was "*abundantly forewarned.*" *Id.* at n.16. This latter statement of the Supreme Court would appear to furnish support for this Court's previous conclusion that some type of warning of alleged discriminatory acts should be given to a party before the applicable limitations period begins to run.

Although the Court indicated that it might prefer an earlier date than the June 26, 1974 letter to *Ricks, id.* at n.17, there is no support in *Ricks* for the Defendants' position herein that the act of the University of Cincinnati Board of Trustees herein was nothing more than an irrelevant formality. In fact, insofar as the *Ricks* Court indicated that an appropriate date for initiating the limitations period might be the date upon which Ricks was informed of the trustees *formal* March 13, 1974 decision to adopt the faculty senate recommendation that tenure be denied, *id.*, it directly undermines the theory advanced by Defendants, which accords no relevance to the Board action taken October 3, 1972.[9]

Based on the preceding analysis, which indicates that actions pertinent to the

---

**9.** Although the Court did indicate that boards of trustees customarily rely on the faculty's expertise in hiring, tenure, termination, and promotion decisions, it made that observation in the course of explaining why Ricks had been adequately forewarned, by June 26, 1974, in a manner sufficient for him "to invoke the protection of the civil rights statutes," *id.* at 262, n.16, 101 S.Ct. at 506, n.16, and not in the context that the action of the board was of no consequence, or significance.

Plaintiff's claims may have taken place on dates up to and including October 3, 1972, the Court concludes that summary judgment is not appropriate on the basis of Defendants' contention that Plaintiff's EEOC charge was untimely because it was not filed within 180 days of the March 29, 1972 offer of employment to Guido Ruggiero.

## VII. *Conclusion*

Based on the foregoing analysis, the Court concludes that, due to the existence of genuine issues of material fact, summary judgment may not be appropriately granted to the Defendants under any of the theories advanced in their Motion for Summary Judgment. Accordingly, the Defendants' Motion for Summary Judgment is, in all respects, denied.

Counsel listed below will take note that a conference call will be had, by conference call telephone communication, at 8:25 a. m. on Friday, February 5, 1982, for the purpose of discussing further procedures to be followed in this case, including, *inter alia*, the setting of a trial date, a final pretrial conference date, and other relevant dates.